## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

|  |  |
|---|---|
| Shakir Hussein, MD<br>1140 Compass Way<br>Newark, DE 19711<br><br>      Plaintiff,<br><br>v.<br><br>Cleveland Clinic Foundation<br>c/o Statutory Agent<br>CT Corporation System<br>4400 Easton Commons Way<br>Suite 125<br>Columbus, Ohio 43219<br><br>and<br><br>Georges-Pascal Haber, MD<br>c/o Cleveland Clinic Foundation<br>CT Corporation System<br>4400 Easton Commons Way<br>Suite 125<br>Columbus, Ohio 43219<br><br>and<br><br>Charleston Area Medical Center<br>501 Morris Street<br>Charleston, WV 25301<br><br>      Defendants. | Case No.<br><br>Judge<br><br>**COMPLAINT**<br><br>(JURY TRIAL DEMANDED) |

## NATURE OF THE ACTION - PRELIMINARY STATEMENT

1.      In March 2024, Cleveland Clinic Foundation and Charleston Area Medical Center renewed the appointment and staff privileges of a transplant surgeon they jointly employed. On April 17, 2024, the surgeon, who is Muslim and African-American, complained to the

Executive Director of Professional Staff Affairs at Cleveland Clinic Foundation that he was experiencing racial and religious harassment and discrimination at the Charleston Area Medical Center and did not believe Cleveland Clinic Foundation was appropriately supportive of him. The next day, Cleveland Clinic Foundation placed him on administrative leave. A few weeks later, Cleveland Clinic Foundation told him he was being fired.

2. This is an action brought by the surgeon under Title VII of the Civil Rights Act, Section 1981, and Ohio and West Virginia law for money damages for Defendants' violations of the surgeon's right to be free of discrimination and retaliation.

## JURISDICTION AND VENUE

3. This action is instituted and authorized under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), 42 U.S.C. § 1981(a) ("Section 1981"), Ohio Revised Code Chapter 4112 ("R.C. § 4112") and The West Virginia Human Rights Act, W.Va.Code Ann. § 16B-17-1 *et seq.* ("WVHRA").

4. Jurisdiction of this Court to hear and determine the claims is based on 28 U.S.C. § 1331 and 28 U.S.C. § 1343. The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

5. On or about August 4, 2024, Plaintiff filed a timely charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), requesting that the charge be cross filed with the Ohio Civil Rights Commission, and the West Virginia Human Rights Commission, alleging that Defendants had discriminated and retaliated against him. The EEOC investigated and issued a notice of right to sue less than ninety

2

days prior to the filing of this action. Plaintiff has satisfied all conditions precedent to bringing and maintaining this action.

6. Venue is proper as one of the Defendants' principle place of business is located in this district and some of the unlawful discrimination and employment practices alleged herein were committed within this district.

## PARTIES

7. Plaintiff, Shakir Hussein, M.D. ("Dr. Hussein") is a United States Citizen.

8. Dr. Hussein's race/ethnicity is Black, African, Arab and Middle Eastern.

9. Dr. Hussein's nation origin is Sudanese.

10. Dr. Hussein's religion is Muslim.

11. At all times relevant to this lawsuit, Dr. Hussein was a "person" and an "employee" within the meaning of Title VII, Section 1981, R.C. § 4112, and the WVHRA.

12. At all relevant times, Defendant Cleveland Clinic Foundation ("CCF"), has been a "person" and an "employer" within the meaning of Title VII, Section 1981, R.C. § 4112 and the WVHRA, and has acted through its managers, supervisors, employees, and other agents.

13. Defendant CCF's principal place of business is in Cuyahoga County, Ohio, in the Northern District of Ohio.

14. At all relevant times, Defendant Charleston Area Medical Center ("CAMC") has been a "person" and an "employer" within the meaning of Title VII, Section 1981, R.C. § 4112 and WVHRA, and has acted through its managers, supervisors, employees, and other agents.

3

15.   At all relevant times, Defendant Georges-Pascal Haber, MD ("Dr. Haber") has been a "person" within the meaning of R.C. § 4112, Section 1981 and WVHRA,

## STATEMENT OF FACTS

16.    Dr. Hussein is a licensed physician and board-certified surgeon. He completed his residency in General Surgery at the Cleveland Clinic Health System, Huron Hospital in 2007 and was awarded the Outstanding Chief Resident Award. He has been certified by the American Board of Surgery since 2008. After completing his General Surgery residency, he completed a two-year fellowship in multi-organ (liver and kidney) transplant surgery at the Columbia University Medical Center in New York.

17.   Dr. Hussein is qualified for the position of kidney transplant surgeon.

## CCF and CAMC were Plaintiff's joint employers.

18.   Since approximately 1987, CCF's kidney transplant program has participated in an affiliated program with CAMC ("affiliated program").

19.   The affiliated program performs kidney transplants at CAMC in Charleston, West Virginia.

20.   The affiliated program involves CCF employing one or more surgeon(s) and assigning them to work in CAMC's hospital in Charleston, West Virginia, where CAMC provides the facilities, equipment, and personnel necessary for the surgeon(s) to perform kidney transplants on CAMC patients.

21.   Everyone who works in the affiliated program except the transplant surgeons are CAMC employees.

22.   On or about June 22, 2022, CCF hired Dr. Hussein to work as a transplant surgeon in the affiliated program at CAMC.

4

23. Although CAMC did not directly hire Dr. Hussein, CAMC interviewed Dr. Hussein and approved his hiring.

24. Before Dr. Hussein could begin work as a transplant and/or general surgeon in the affiliated program at CAMC, he had to apply for privileges at CAMC.

25. Before Dr. Hussein could begin work as a transplant and/or general surgeon in the affiliated program at CAMC, CAMC had to approve his application for privileges.

26. Before Dr. Hussein could begin work as a transplant and/or general surgeon in the affiliated program at CAMC, he was required to provide CAMC with any information CAMC requested related to his qualifications for the position.

27. CAMC investigated Dr. Hussein's qualifications to work as a physician before allowing him to work as a transplant and/or general surgeon in the affiliated program.

28. Before Dr. Hussein could begin work as a transplant and/or general surgeon in the affiliated program at CAMC, CAMC's Office of Medical Affairs, Department Chief, Credentials Committee, Medical Executive Committee and Board of Trustees all reviewed the information collected by CAMC in its investigation of Dr. Hussein's qualifications.

29. Before Dr. Hussein could begin work as a transplant and/or general surgeon in the affiliated program at CAMC, he required the approval of CAMC's Office of Medical Affairs, Department Chief, Credentials Committee, Medical Executive Committee and Board of Trustees.

30. Dr. Hussein worked as a transplant surgeon and general surgeon in the affiliated program at CAMC from approximately January 25, 2023, until approximately April 18, 2024.

31. While Dr. Hussein worked in the affiliated program at CAMC, CCF paid him a salary and provided employment benefits to him.

5

32. While Dr. Hussein worked in the affiliated program at CAMC, CAMC reimbursed CCF for the cost of Dr. Hussein's salary and benefits.

33. While Dr. Hussein worked in the affiliated program at CAMC, CCF exercised no control over his day-to-day activities.

34. While Dr. Hussein worked in the affiliated program at CAMC, he did not have an office at CCF and did not have patients at CCF.

35. While Dr. Hussein worked in the affiliated program at CAMC, CCF did not play a role in his work at CAMC and did not exercise any control over his work at CAMC.

36. While Dr. Hussein worked in the affiliated program at CAMC, the patients he treated were patients of CAMC.

37. While Dr. Hussein worked in the affiliated program at CAMC, CAMC kept and maintained all of Dr. Hussein's patient records as its own property.

38. While Dr. Hussein worked in the affiliated program at CAMC, CAMC provided him with a CAMC email address.

39. Although Dr. Hussein also had a Clinic email address, he was often unable to access it, and he did not have a Clinic computer while he worked in the affiliated program at CAMC.

40. While Dr. Hussein worked in the affiliated program at CAMC, CAMC billed for and collected all fees that Dr. Hussein generated and retained those fees as its own revenue except that it reimbursed CCF for the cost of Dr. Hussein's salary and benefits.

41. While Dr. Hussein worked in the affiliated program at CAMC, CAMC included Dr. Hussein in its advertising and promotional materials for its kidney transplant program.

42. While Dr. Hussein worked in the affiliated program at CAMC, he was required to adhere to the same medical staff rules and regulations as surgeons employed by CAMC.

43. While Dr. Hussein worked in the affiliated program at CAMC, CAMC expected him to comply with the same policies and procedures as surgeons employed by CAMC.

44. While Dr. Hussein worked in the affiliated program at CAMC, he wore CAMC scrubs and a CAMC identification badge.

45. While Dr. Hussein worked in the affiliated program at CAMC, CAMC took care of the administrative and procedural aspects of Dr. Hussein's daily activities, just as it did for the other physicians it employed.

46. While Dr. Hussein worked in the affiliated program at CAMC, CAMC possessed and furnished all of the equipment Dr. Hussein used to perform his job duties.

47. While Dr. Hussein worked in the affiliated program at CAMC, CAMC provided and had control over his workplace.

48. While Dr. Hussein worked in the affiliated program at CAMC, Dr. Hussein was assigned to work exclusively at CAMC.

49. For much of the time Dr. Hussein worked at CAMC in the affiliated program, he was the only full-time surgeon who performed kidney transplant surgeries at CAMC.

50. While Dr. Hussein worked in the affiliated program at CAMC, CAMC had exclusive control over his surgical schedule because his operating room, equipment and staff were provided by CAMC.

51. While Dr. Hussein worked in the affiliated program at CAMC, his job duties were akin to the job duties of surgeons who were employed by CAMC.

**Dr. Hussein experiences, and complains of, discrimination and harassment.**

52. The workload of the affiliated program increased significantly between 2022 and 2023. During that time, the number of kidney transplants approximately doubled.

7

53.     One of the reasons the workload of the affiliated program increased involved initiatives to enhance patient access to transplants, driven by the federal government and the organ donation and transplant community.

54.     On October 7, 2023, local, state, national and international media reported that an Islamist militant group attacked civilians and soldiers in Israel, killing more than 1,000 people and taking hundreds more as hostages. Israel announced that the country was "at war," and thereafter the media reported daily on the death toll of the war between Israel and the Islamist militant group, what was known about the hostages, and reports that the Islamist militant group had committed acts of atrocities.

55.     After October 7, 2023, Dr. Hussein began to feel that some of his coworkers at CAMC were harassing him and discriminating against him because of his race, ethnicity, national origin and/or religion.

56.     Beginning in November 2023, Dr. Hussein was the only full time clinician employed in the affiliated program, and the workload was more than he could reasonably perform alone. He did not have resident coverage during November. He requested that CAMC assign a physician's assistant or a nurse practitioner, but CAMC did not assign one. He requested that CAMC retain a locum surgeon, but CAMC did not retain one until February 2024. A local surgeon covered for Dr. Hussein over a couple of weekends. Dr. Hussein felt that CAMC was depriving him of resources so that he would either fail in his job duties or resign.

57.     In December 2023, the CAMC transplant team participated in a Christmas parade hosted by the City of Charleston. Because of his religion, Dr. Hussein declined to attend.

58. A few days before the parade described above, the CAMC transplant administrator, Alice Jones, questioned Dr. Hussein about why he was not participating in the Christmas parade. Although he did not tell her it was because of his religion, she expressed her belief that if the parade was named "anything but Christmas" he would have attended.

59. Alice Jones later questioned Dr. Hussein about his religious practices and whether he would eat certain food or accept Christmas gifts.

60. Alice Jones' questions about Dr. Hussein's religion made Dr. Hussein uncomfortable.

61. On December 25, 2024, a kidney became available for transplant at the CAMC hospital where Dr. Hussein worked.

62. On the afternoon of December 25, Dr. Hussein scheduled surgery to transplant the kidney that evening. In the late afternoon, the on-call CAMC CRNA telephoned him and berated him for scheduling the surgery on Christmas. She told him she would not allow his surgery to proceed unless he "cleared it" with a "trauma surgeon." She told him, falsely, that the OR did not have the resources to perform the surgery. Dr. Hussein objected to the confrontational way she was speaking to him, and she responded that she could speak to him any way she wanted because, she told him, "This is America," and "I have rights." She indirectly referenced his religion by stating that he was scheduling a surgery on Christmas because "he can."

63. Dr. Hussein was subsequently told that CAMC received an anonymous complaint accusing him of being abusive to CAMC staff.

64. In an email dated January 8, 2024, Dr. Hussein reported the CRNA's behavior to CAMC, Heidi Edwards, CAMC Vice President/Administrator, Chief Nursing Officer, and Dr. Shelda Martin, Vice President, Chief Medical Officer. He copied Jones and CAMC

9

hospital administrator Glen Martin on the email. In the email, he told them he considered the conduct of the CRNA to be "an attack on [his] community that "cannot be reasonably explained by anything but prejudice" that was "playing the stereotype of the Muslim, middle eastern, male…" He provided examples of the CAMC staff treating him with overt hostility, including one incident where a CAMC front desk employee asked him if he knew how to read and attempted to physically confront him. Dr. Hussein wrote that knowing that "one of our health care colleagues may harbor such stereotypes is disturbing," and "a fact that I have to live with on regular basis. Unless we choose to bury our head in the sand, this type of prejudice is running rampant these days."

65.     In Dr. Hussein's email to Edwards and Martin, described above, he wrote, "I still can't wrap my head around the concept of a health care provider attempting to place an older patient's life in jeopardy just to enjoy few hours of time off during a shift she signed up for. . . . I don't know how a health care provider who intentionally and persistently tries to harm a patient for a personal convenience, can be trusted on human lives."

66.     Dr. Hussein's email to Edwards and Martin, described above, was a complaint of discrimination based on race, ethnicity, religion and/or national origin protected by law.

67.     Dr. Hussein's email to Edwards and Martin, described above, expressed a serious concern for patient safety.

68.     Dr. Hussein also reported the incident with the CRNA to Dr. Alvin Wee, the director of the kidney transplant program at CCF, and Dr. Wee told Dr. Hussein to discuss it with his department chair, Dr. Haber, who was then the Chairman of the Glickman Urologic Institute at CCF.

69. On January 8, 2024, Dr. Hussein sent an email to Dr. Haber, copying Dr. Wee. Dr. Hussein told Dr. Haber that he felt the incident was "a form of Islamophobia," that caused him "a couple of nights of insomnia," and that he needed "to learn how to cope with these incidents" because he felt that CAMC's "culture is unlikely to change overnight." He expressed that the incidents were repeated and that fact, "combined with the lenient approach of CAMC leadership" caused him to "feel uncomfortable and insecure."

70. Dr. Hussein's email to Dr. Haber, described above, was a complaint of discrimination based on race, ethnicity, religion and/or national origin protected by law.

71. In Dr. Hussein's January 8, 2024 email to Dr. Haber, described above, he asked to speak with someone from CCF's legal department and diversity office.

72. In Dr. Hussein's January 8, 2024 email to Dr. Haber, described above, Dr. Hussein wrote that he wanted "to learn how to protect himself without creating any adversarial relationship with the leadership at CAMC.

73. On January 10, 2024, Dr. Hussein and Dr. Haber had a preplanned virtual meeting.

74. During Dr. Haber and Dr. Hussein's virtual meeting on January 10, 2024, they discussed Dr. Hussein's complaint of discrimination. Dr. Haber responded that Dr. Hussein should be "the bigger person and not worry about workers who are not high in the ranks." Dr. Haber then stated that if Dr. Hussein didn't feel "safe" in his employment, Dr. Haber would have to "remove" him and would have nowhere to "put" him. Dr. Haber then cautioned Dr. Hussein not to "disappoint" him.

75. Dr. Hussein understood that Dr. Haber was warning him not to complain about discrimination.

11

76.    On January 11, 2024, Dr. Hussein met with Edwards and Shelda Martin, MD, CAMC Associate Chief Medical Officer. to discuss the December 25, 2023 incident with the CRNA. They told Dr. Hussein that they asked the CRNA if she was comfortable continuing to work with him and because she said she was, they would continue working together. They did not ask Dr. Hussein if he was comfortable continuing to work with the CRNA.

77.    The CRNA was not disciplined for making discriminatory statements to Dr. Hussein.

78.    The CRNA was not disciplined for attempting to cancel a potentially life-saving surgery for personal convenience.

79.    Dr. Hussein was required by CAMC and CCF to continue to work with the CRNA in the affiliated program.

80.    Edwards directed Dr. Hussein to meet with Kristi M. Snyder, the Vice President for Human Resources for CAMC's parent corporation, Vandalia Health, to "learn more about CAMC's Diversity, Equity and Inclusion initiatives."

81.    Dr. Hussein met with Snyder on January 26, 2023.

82.    In late February or early March 2024, during a selection meeting to evaluate two young African American male patients for kidney transplant, several CAMC staff members made derogatory comments about the patients. The patients were on dialysis. Dr. Hussein believed the staff's derogatory comments were because of the patients' race. One staff member said that kidneys would be "wasted" on the patients. Another called them "nasty" or something similar. Dr. Hussein was concerned that the patients' evaluation and treatment might be affected by racial stereotyping.

83. When Dr. Hussein heard the staff's comments, described above, he expressed that he did not believe the staff members were behaving professionally and he wanted to ensure that no decision was made until the social evaluation was completed.

84. After the selection meeting, described above, Alice Jones told Dr. Hussein that she was offended by his comments defending the patients.

85. On Friday, March 1, 2024, several CAMC employees forced Dr. Hussein to cancel a kidney transplant surgery.

86. The patient who was scheduled to receive the transplant was an immigrant from Central America who spoke little English.

87. The transplant surgery was scheduled for a Friday evening.

88. Before the surgery, Dr. Hussein informed the staff that the kidney required some reconstruction, the reconstruction would take time, and if the reconstruction was unsuccessful, the case would be abandoned.

89. After Dr. Hussein completed the reconstruction, tested the arteries and veins, and determined the organ was viable for transplant, he asked a member of the operating room staff to bring the patient into the operating room. The staff member responded that the case was on hold.

90. Dr. Hussein asked why the case was on hold, and the staff member told him that the operating room staff felt this kidney is not "suitable" and had contacted the administration.

91. Dr. Hussein scrubbed out and spoke with Alice Jones and CAMC hospital administrator Glen Martin, who told him the staff claimed Dr. Hussein was saying negative things about kidney.

92.  Alice Jones and Glen Martin did not tell Dr. Hussein what, specifically, the staff claimed he said.

93.  Because Dr. Hussein did not know what, specifically, the staff claimed but was informed that healthcare workers expressed that the organ was not suitable for implant and would place the patient at risk, Dr. Hussein did not perform the transplant surgery.

94.  CAMC later told Dr. Hussein that employees claimed they heard him saying he was "crazy" and "doing things" he was "not supposed to do." Dr. Hussein did not say those things.

95.  Because the surgery was canceled, the kidney was not used, and the patient did not receive a transplant at that time.

96.  Dr. Hussein again complained to Heidi Edwards that he felt that some of his coworkers at CAMC were prejudiced against him and that those coworkers interfered with his ability to provide medical care and treatment to his patients.

97.  Dr. Hussein's complaint to Edwards, described above, was a complaint of discrimination based on race, ethnicity, religion and/or national origin protected by law.

98.  Dr. Hussein also complained to Dr. Wee that he did not believe CAMC took appropriate action in response to his complaints of discrimination.

99.  Dr. Hussein's report to Dr. Wee, described above, was a complaint of discrimination based on race, ethnicity, religion and/or national origin protected by law.

100.  A few days later, Dr. Wee telephoned Dr. Hussein. During their conversation, they discussed Dr. Hussein's concern about discrimination again and Dr. Wee cautioned Dr. Hussein that another Clinic surgeon "spoke like that" and was asked to leave CCF.

14

101.   Although Dr. Wee did not identify him by name, Dr. Wee was referring to Dr. Charles Modlin, an African American kidney transplant surgeon who left the Cleveland Clinic in 2021.

102.   Dr. Hussein understood that Dr. Wee was warning him not to complain about discrimination.

103.   CAMC failed to take any remedial action in response to Dr. Hussein's complaint of discrimination.

**Defendants retaliate against Dr. Hussein**

104.   Prior to March 1, 2024, neither CCF nor CAMC informed Dr. Hussein that they had any criticisms of his work performance.

105.   According to the Letter of Intent provided to Dr. Hussein by CCF, Clinic policies require that before renewing Dr. Hussein's contract, CCF must first conduct an annual performance review ("APR"), "which includes a comprehensive evaluation of productivity, patient satisfaction scores, publications and research, and other information typical of any professional medical organization."

106.   On March 11, 2024, CCF informed Dr. Hussein that it had completed his APR during the first quarter of 2024. CCF offered, and Dr. Hussein accepted, reappointment to the professional staff until March 31, 2025.

107.   On March 13, 2024, CAMC had an event to celebrate the affiliated program, which had performed 128 transplants in 2023. CAMC publicly announced that the affiliated program had "saved" 128 lives in 2023. Dr. Hussein performed the vast majority of the 128 transplants.

15

108. On March 26, 2024, Dr. Bryan Richmond, CAMC surgeon and Chairman of the Department of Surgery at CAMC Institute for Academic Medicine, signed a letter to Dr. Haber stating that "since Dr. Hussein's arrival the transplant program has continued to grow, and he has demonstrated himself to be a true asset to the institution not only in terms of the clinical service he provides but in terms of the education he provides to medical students and residents. We want to retain him greatly…"

109. On March 28, 2024, CAMC notified Dr. Hussein that on March 26, the CAMC medical staff met and approved his reappointment to "the Medical Staff of Charleston Area Medical Center, Inc., from 04/01/2024 through 11/30/2025…"

110. Also on March 28, 2024, the United Network for Organ Sharing (UNOS) informed CAMC, through Alice Jones, that a subcommittee of the OPTN Membership and Professional Standards Committee (MPSC) reviewed CAMC's "key personnel change application proposing Dr. Shakir Hussein as the primary transplant surgeon for the kidney transplant program and as the primary donor surgeon for open and laparoscopic nephrectomies for the living donor kidney component at Charleston Area Medical Center" and concurred "that the kidney transplant program along with the living donor component at WVCA remain in compliance with OPTN membership criteria and granted the application for personnel change "interim approval" effective March 28, 2024." In the letter, UNOS explained that its staff reviews issues that may involve any member's noncompliance, including "potential threats to patient health and public safety," and stated that "the application will subsequently be reviewed by the full MPSC when it meets April 23, 2024. When the MPSC considers this matter, it may modify the subcommittee's recommendation

for approval, and a formal communication of the committee's decision will be provided after the April MPSC meeting."

111. CAMC did not withdraw their application or provide UNOS any information to cause it to change its decision, and on April 26, 2024, UNOS informed CAMC, through Jones, that CAMC's "key personnel change application proposing Dr. Shakir Hussein as the primary transplant surgeon for the kidney transplant program and as the primary donor surgeon for open and laparoscopic nephrectomies for the living donor kidney component at Charleston Area Medical Center" had been approved on April 23, 2024.

112. On April 17, 2024, Dr. Hussein spoke to Matt Donnelly, the Executive Director of Medical Staff Affairs at CCF. Dr. Hussein told Donnelly that he believed he was being discriminated against by CAMAC and that CCF and Dr. Haber were not supporting him.

113. Dr. Hussein's statement to Matt Donnelly, described above, was a complaint of discrimination based on race, ethnicity, religion and/or national origin protected by law.

114. On April 18, 2024, CCF placed Dr. Hussein on administrative leave and instructed him not to see patients at CAMC.

115. CCF placed Dr. Hussein on leave because of his race, national origin, ethnicity and/or religion, and/or in retaliation for his protected complaints in violation of Title VII, Section 1981, R.C.§ 4112 and WVHRA.

116. CAMC and Dr. Haber conspired with CCF and/or aided, abetted, incited, compelled, and/or coerced CCF to place Dr. Hussein on administrative leave because of his race, national origin, ethnicity and/or religion, and/or because of his protected complaints in violation of Title VII, Section 1981, R.C.§ 4112 and the WVHRA.

117. On April 30, 2024, Dr. Hussein met virtually with Dr. Haber and Matt Donnelly. During that meeting, Dr. Haber told Dr. Hussein he had "disappointed" him.

118. On May 8, 2024, CCF told Dr. Hussein that he would be terminated on August 15, 2024, and would remain on paid leave until then.

119. CAMC and Dr. Haber conspired with CCF and/or aided, abetted, incited, compelled, and/or coerced CCF to terminate Dr. Hussein because of his race, national origin, ethnicity and/or religion, and/or because of his protected complaints in violation of Title VII, Section 1981, R.C.§ 4112 and WVHRA.

120. CCF terminated Dr. Hussein on August 15, 2024.

121. Defendants terminated Dr. Hussein's employment because of his race, ethnicity, national origin, religion and/or because of his protected complaints of discrimination.

## COUNT I – CAMC
## DISCRIMINATION IN VIOLATION OF TITLE VII

122. Plaintiff alleges each and every paragraph set forth above as if rewritten here, and further states that Defendant CAMC discriminated against him in the terms and conditions of employment, interfered with his ability to be successful in his work, and created a hostile and offensive work environment, because of his race, ethnicity, national origin and/or religion, in violation of Title VII.

123. Defendant CAMC terminated Dr. Hussein's employment, because of his race, ethnicity, national origin and/or religion in violation of Title VII.

124. As a direct and proximate consequence of CAMC's unlawful, discriminatory misconduct, described above, Dr. Hussein suffered emotional distress and humiliation, lost salary,

wages, and benefits; incurred attorneys' fees and costs of litigation; and has been otherwise injured. Some or all of his damages will continue to accrue indefinitely into the future.

125. CAMC is liable to Dr. Hussein for compensatory damages pursuant to Title VII.

126. CAMC's conduct, described above, was done with malice or with reckless indifference to Dr. Hussein's federally protected rights, for which CAMC is liable for punitive damages.

## COUNT II – CAMC AND CCF
## RETALIATION IN VIOLATION OF TITLE VII

127. Plaintiff alleges each and every paragraph set forth above as if rewritten here, and further states that Defendants CAMC and CCF engaged in a retaliatory investigation against him and terminated his employment because of his protected activity in violation of Title VII.

128. As a direct and proximate consequence of Defendants CAMC and CCF's unlawful, retaliatory misconduct, described above, Dr. Hussein suffered emotional distress and humiliation, lost salary, wages, and benefits; incurred attorneys' fees and costs of litigation; and has been otherwise injured. Some or all of his damages will continue to accrue indefinitely into the future.

129. CAMC and CCF are liable to Dr. Hussein for compensatory damages pursuant to Title VII.

130. CAMC and CCF's conduct, described above, was done with malice or with reckless indifference to Dr. Hussein's federally protected rights, for which they are liable for punitive damages.

## COUNT V – RACE/ETHNICITY DISCRIMINATION AND RETALIATION
## IN VIOLATION OF 42 U.S.C. § 1981

131. Plaintiff alleges each and every paragraph set forth herein as if rewritten here, and further states that the discriminatory and retaliatory actions of CAMC and CCF articulated above violate 42 U.S.C. § 1981, which guarantees that all persons within the jurisdiction of the

United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by citizens of other races and prohibits discrimination on the basis of race and ethnicity, and prohibits retaliation against an employee for making a complaint of discrimination on the basis of race or ethnicity.

132. As a direct and proximate result of Defendant CAMC and CCF's illegal misconduct, as described above, Plaintiff lost salary, wages, and benefits; suffered emotional distress, upset, and humiliation; incurred costs of litigation, including attorney fees; and has been otherwise injured, the extent of which will be more fully revealed at the trial of this matter. Some or all of Plaintiff's damages will continue to accrue indefinitely into the future.

133. CAMC and CCF are liable to Dr. Hussein for compensatory damages pursuant to Section 1981.

134. CAMC and CCF's conduct, described above, was done with malice or with reckless indifference to Dr. Hussein's federally protected rights, for which they are liable for punitive damages.

## COUNT VII – DISCRIMINATION AND RETALIATION IN VIOLATION OF OHIO REVISED CODE § 4112

135. Plaintiff alleges each and every paragraph set forth herein as if rewritten here, and further states that by engaging in the discriminatory and retaliatory actions described herein, Defendants violated R.C. § 4112 and are liable to Plaintiff for compensatory damages under Ohio law.

136.   Defendants' conduct, described above, was done: maliciously or with conscious disregard of Dr. Hussein's rights and with a great probability of causing harm, and/or was done maliciously and/or by aggravated or egregious fraud by Defendants' agents or servants, who, as principal or master, knowingly authorized, participated in, or ratified those actions and/or omissions, for which Defendants are liable for punitive damages.

## COUNT VII – DISCRIMINATION AND RETALIATION IN VIOLATION OF WEST VIRGINIA LAW

137.   Plaintiff alleges each and every paragraph set forth herein as if rewritten here, and further states that by engaging in the discriminatory and retaliatory actions described herein, Defendants violated WVHRA and are liable to Plaintiff for compensatory damages under West Virginia law.

138.   Defendants' conduct, described above, was done with actual malice and/or in conscious, reckless and outrageous indifference to Dr. Hussein's rights for which Defendants are liable for punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants in an amount that includes all lost income, wages and benefits incurred at the time of trial, compensatory damages in an amount that will fully and fairly compensate him for his injury, damage, and loss, liquidated and/or punitive damages in such an amount as will sufficiently punish and deter the wrongful conduct of Defendants, reasonable attorney fees and costs of suit, and pre- and post-judgment interest, and such other legal and equitable relief as is necessary and proper.

## JURY DEMAND

A trial by jury is hereby demanded.

21

Respectfully submitted,

*/s/ Cathleen Bolek*
CATHLEEN M. BOLEK (0059884)
MATTHEW D. BESSER (0078071)
**BOLEK BESSER GLESIUS LLC**
5885 Landerbrook Drive
Suite 302
Cleveland, Ohio 44124
T 216.464.3004
F 866.542.0743
cbolek@bolekbesser.com
mbesser@bolekbesser.com

*Counsel for Plaintiff*

22